Good morning, Your Honors. I'm Alan M. Ansruth on behalf of Marisela Castro-Juarez. This is a case that comes before the Court to review whether summary judgment is the appropriate avenue for decision in a case involving denaturalization. The case was decided by the District Court in San Diego with the judge concluding that there are no triable issues of fact in dispute and we disagree vehemently with the judge's decision. Ms. Castro-Juarez applied for naturalization in February of 1996. She was interviewed by the government on that application three months later, May of 1996, and sworn as a citizen on January of 1997. The issues in dispute are whether Ms. Castro-Juarez materially and knowingly withheld information about any criminal arrest or criminal record in the case. She provided to the District Court a six-page very detailed sworn declaration in furtherance of her position that there were disputable facts as to her state of mind. And that is what this case comes down to. Naturalization, the Court's cases tell us that naturalization brings a very heightened standard as to whether summary judgment should ever resolve a case without going to trial. Okay. That's clear, convincing, unequivocal evidence. No, absolutely not. I said this is okay. What we're looking at is willful, right? Yes. So we're looking at deliberate and voluntary? You're also looking at knowingly. Well, I guess no specific intent necessary, but a knowledge of falsity is enough. That may well be. That's right. Correct? I will agree. Okay. So what we're really about then is, is the party state of mind such that they would have knowledge of the falsity? And I agree. And the answer is no. At this point, why didn't we have an expert? Well, the Court would not allow us to go forward to the trial, Your Honor. Well, why didn't we have? I've been in your spot many times. I go get an expert. I get a declaration who comes in and says, I can suggest that this state of mind is not willful because she couldn't make that determination. I mean, I looked all over to try to find how one can testify to their own state of mind. I could find no case that suggests one can. So there's no reason for the judge to believe what she testifies. I did find our case, Frazzoni versus the United States, our case in 1959, which says, as a general rule, a witness may not testify to their own medical condition, past or present. And therefore, no reason to receive testimony that she has about what she's got to think about because it can't be admitted. It can't be believed. Nobody can talk about their own state of mind. So it would have been easy to file such a declaration, and it wasn't filed. Well, Ms. Castro-Juarez did try to go back to her places of origin to find records that would support her position. Well, the affidavit that she submits just tells a horrific story of sexual abuse and drug use and so on. The evidence that she withheld was that she had spent some 220, between 220 and 290 days in jail. That seems very different in quality and kind from saying that she was abused by her mother's boyfriend or she was abused by an uncle or a neighbor. Those things might be repressed, but it's hard to lose a year of your life that was spent in jail. So that was the material withholding. It's not the withholding of information about how she was abused sexually, but that she had gone to jail and been arrested in Fresno. So what evidence have you got? And why didn't somebody come forward, some doctor, somebody, and say, wow, she was so traumatized as a youth because of this sexual abuse that she can't remember anything? The Court is correct in pointing these matters out, but the Court must also realize that this is a person that spent five years in federal prison undergoing, I believe, 500 hours, 500 hours of drug treatment and analysis. And that is where she realized and came to understand what she had done in the past. Right. But most of the affidavit is devoted to saying, here are the recovered memories that I have of being sexually abused. Nobody was asking her to tell the immigration officials about sexual abuse. The question related to whether you have been arrested, and she had spent almost a year of her young life in a state facility because of a crime that she had committed, and she doesn't answer the question accurately. She doesn't remember that she spent a year of her life in jail. How do we get around that, counsel? You have no evidence whatsoever from anybody else to say, yeah, one's going to suppress a year in jail. The evidence that we have, Your Honor, that all this came to light only with the respondents, Ms. Castro-Hortiz's deposition that the government conducted in 2013, when the government presented documentary evidence that she had been arrested, that there had been a case that had been calendared in the Court. And she had no recollection of that arrest until that moment. That's the Fresno arrest. That's correct. Okay, that's not the time for which she spends almost a year of her life in jail. That's not the crime for which she spends almost a year of her life in jail. That's correct. She had an obligation to disclose to the officer that she had been arrested and had spent nearly a year of her life in jail. She didn't do that. That's because, Your Honor, she didn't realize that. She didn't realize what? That she had spent a year in jail? That's correct. And what evidence do we have for that? We have, to this point in time, Your Honor, we have only her six-page sworn declaration. But we also have in the record her 1996 application, which she's able to list all of her prior residences, going back a number of years. I don't think that recollecting arrests or convictions or negativity is the same as remembering where you lived. She could remember all the places that she lived, except for the years she spent in jail. She couldn't remember that she had been in jail? That wouldn't be among the addresses at which she had lived? Well, Your Honor, the naturalization application would have been dated February of 1996. You only have to provide residences that go back five years. That's outside the time in which she was held in custody or incarcerated. The form itself only asks for five years. Right. So she doesn't misrepresent anything about where she lived in the previous five years. My point is, she had a good enough memory of those things, but why couldn't she remember she had spent a year in jail? How old is she in 1996? She was in her 20s. Yeah, she's in her 20s and a whole year was spent in a state facility. She can't remember that? Your Honor, if I've never been in a position where I've taken drugs or I've lived on the street and been homeless and... Why didn't we have a doctor come and say, this is a problem with this kind of, when you've been under these kinds of circumstances? I understand. But the case is what it is. You understand. I mean, Judge Bybee's questions, he stole right out of my mouth. The bottom line is, she remembers some things, but not a year in jail. The problem is, she remembers some things, but the things she absolutely needed to say. And then she comes forth and says, and there's all kinds of evidence that maybe somebody can be repressed and not get it. But there's no evidence, no records, nothing I can find, suggest one can remember this or that, but leave out the very most important stuff. And then we got no doctor to tell us that what's going on here is really worthwhile. Otherwise, you're saying on a summary judgment, the district court is to believe her and go to trial. Well, from everything that I can read, the district court should have taken the respondent's sworn statement. I think he did take the district court's sworn statement, but there was no reason to believe it because it wasn't valid. There was nothing validity about it of her being able to testify. It is not unbelievable testimony. There are triable issues here. And the judge leaped over the requirements to read favorably this applicant's sworn statement in the most favorable light to her. And I believe that the district court judge is obligated to do that. Are there not disputable facts here? Even if it's irrelevant, even if it can't give any credence to what she is suggesting, you can give all the credit you want to something. But if it does can't give any credence to what you're saying, then the district court can review it all that they want to. But they can't give it any substance. They can't give it any reason to deny or to, yeah, to deny the summary judgment. That's what I'm saying. We do this in medical malpractice cases. We do this in common ordinary negligence cases. We do this all the time. We have to give credence to what we can give. And this is one where there's no credence allowed. Does the court not believe that there are issues of triable fact here? There can't be triable fact if you can't give credence to any fact that's been given. Well, you know, there's been recent research on some of the issues that impinge on this case. And I have an article from Science Daily, a reputable source and publication, that tells us that some stressful experiences such as chronic childhood abuse are so traumatic the memories hide like a shadow in the brain and can't be consciously assessed. Eventually suppressed memories can cause debilitating psychological problems. Scientists have discovered how and where the brain stores those stressful memories. So we've learned that, where these stressful memories are stored and how to retrieve them. The findings could lead to a new treatment for patients with repressed traumatic memories. And I think what you're arguing is that she has gone through scores of stressful situations. By the time she was a youngster with rapes of uncles and other relatives. Her mother's boyfriend and a mother then left her and the other siblings and went back to Mexico with the boyfriend who was raping her. And this went on. When she was in foster homes she encountered the same type of terrible experiences. And that these were so awful that whole periods of her life were suppressed. And when she took the oath of citizenship she did bring forth some of this information about times she had spent in custody. Because those memories had all been suppressed. And it wasn't until she went to a federal prison, I believe, that she underwent a long period of group therapy and individual therapy. And by that process the fog, whatever you want to call it, started to disappear. And many of these memories came back. And she's learned how to deal with them. And she's a different person today. And she's been out of prison now for what, how many years? About four years. Four years. And she's brought her children back to her. She works as a sous chef in a nice restaurant in San Diego. Her eldest daughter is in college at San Diego State. The other two children are in school and doing well. And so, and to take away citizenship, the burden is on the government to come up with clear and convincing and unequivocal evidence. And that hasn't happened in this case. I believe every word that you say. And what you would like to have is to have this matter go back to the district court and have a hearing over there. Is that what you're asking for? Yes, sir. Yeah. And that shouldn't take long. Now, refresh my memory. Was there a hearing before a district court in this case? The only hearing that we had was for the issue of the summary judgment. On the summary judgment. Well, you've got here her state of mind, you know. That's a fact that we have cases that say that. And that in face of what she went through, that a trier of fact, hearing the evidence and hearing the experts, then can determine what her state of mind was when she took the oath of citizenship. Yes. That's what you want. That's all I want. That's all you want. That's all. I believe we can prove the case at trial. And your client is here today. She is. She's sitting in the front row. Yeah, sitting in the front row. I might add that the district court did agree with us at oral argument. Yeah, the district court did agree with you at oral argument. And the district court chastised the state. That is correct. And the state dropped the ball, too. And the district court has got a footnote expressing its frustration with the state. Because all the state finally came up with was on this question of materiality. Is that right? Yes, Your Honor. Okay. At the end of the day, we believe that the government has not proven its case. By clear, convincing, and unequivocal evidence. And that is called a heavy burden. Especially in denaturalization cases. That's what this court tells us. All right. Thank you. Counsel, I'll give you a minute after we hear from the government. Appreciate that very much. May it please the court. Ari Nazaroff on behalf of the United States. Oh, just very quickly. My opponent mentioned that his client did not have to disclose anything before five years. That naturalization application, which is at our excerpt of record we attached, DRO3 specifically asked question number 15, B, have you ever been arrested, cited, charged, indicted, convicted, so on and so forth. And she checked off no. She, again, reiterated that under oath while undergoing her interview. And so she had been asked if she had ever been arrested. And she indicated no. Although she had been a number of times. I'd just like to point out, Your Honors, that the science article that was just mentioned is not in the record. So it is not. Well, I know that, but I can take judicial notice of it. Well, Your Honor, there's no medical evidence. I just came across this because I wondered about it. Because I get, my wife gets these publications, and I look through one. This is one called Science News. It comes out every week. And I noticed that in Science News, it tells us lost memories retrieved from mice with Alzheimer's, and new clues about how brain handles memories, and how that process can go awry. And then it tells us that we've developed new approaches on how to activate memory-holding cells. And so science is on this. And I'll be happy to give these to you. Frankly, I understand your objection, and I don't know whether it's going to do you any good to argue about that. I, what I would like to ask is, what could she recall? I mean, your counsel suggests that she can't recall arrests. She can't recall going to jail for almost a year. She can't recall all these things. She can't recall a bench warrant. She can't recall all kinds of things. What could she recall of the same time period? Well, she recalled in detail where she had lived, the job she had had. She had failed the first time, the citizenship examination. She had the presence of mind to ask for a retake, prepare for it, and pass a second time. So she was able to do that. So all the evidence points in the direction of, and there's no dispute about any of that, that she had the presence of mind to fill out that application and fully remember all those details. The job, the locations where she lived only went back five years, as her counsel pointed out. Isn't that correct? That would get us back to about 1991. She was, 1985 is when she was jailed. In 89, she was arrested, and she- That's the Fresno arrest. That's not the jail period. The jail period is like 1985, 1986. Right. That's right. So do we have, is there anything on the form that would have indicated that she understood things from her childhood or understood things from her teenage years?  I know, Your Honor. She didn't mention, there's membership in organizations, I don't see, I suppose, information going back before the five years. But it's funny that her memory would, there's no evidence in the record to show that she remembered those five years. I will say this. She was arrested in 1989, and she failed to show up for, she did not show up in court, and that's why the warrant was issued. But on ER, this is our Appellant's Executive Record, on ER 2, it goes back to 1990 and 1991, this time period. Wasn't that that last day when she spent two nights in prison? And she'd been taken, what was it, LSD? PCP. Yeah. What? PCP. PCP. I mean, I got a lot of acronyms to keep in my mind. She'd been taken PCP, and she'd been taking it over a period of time. And, but what we're talking about is suppressing memory of events that created pain for her, and which she suppressed. She did not, I don't think she's arguing that everything, you know, what she eats for breakfast she suppresses. She suppresses memories of events that created a lot of pain and anxiety for her. She puts that out of her mind almost as a survival mechanism. There's science that supports it. Your Honor, I'd just like to really quickly finish Judge Bybee's question. Part 4, ER 02, she lists her address in 1990, 1991, pretty detailed there. That's the time she was arrested. And during, and she was able to recall with detail her arrest, and that the women were screaming in the prison, that the atmosphere in that prison with strong detail. And she recalls that when? Well, she recalls it when I took her deposition in 2013, she recalled that. She didn't put it in her application, but again. The whole question is, as of 1996, did she recall things that occurred in 1985, 1986, so 10 years earlier? Isn't that really the issue here? Well. The issue is not whether she remembers it in 2013. Nobody disputes that. The issue is what she knew in 19, what she recalled in 1996 about the 1985, 1986 incident for which she was jailed for almost a year. The 1989 to 1990 arrest in Fresno, for which she was, for which she did not report to court. That's right, Your Honor. And I can't, I can't point to the N-400 and tell you that there's any information there about the earlier 85, 86. Right. But in detail, she could recall where she lived in 1990, which is at the time of her, this was a time of her, just a year after her, after her arrest for PCP. And that she used drugs from, she testified she used drugs from 86 to 90. And she recalled that she didn't, she didn't like the way they felt. So she, she no longer used them after 1990. So in a way I can answer your question is to look at part four on ER 0002. She does recall where she lived in 1990. So that's very close to the rest. And the bench warrant was, and to the time of the bench warrant, which was issued and for which she did not show up in court. As a fugitive, she would have not been able to naturalize. If this panel has no further questions, we will rest on our briefs. Okay. Mr. Nazaroff, thank you. Mr. Anzaruth, you have, I'll afford you a minute. If there's anything that you'd like the panel to know. Ms. Castro-Hortiz is a victim in this case. Victim of her own life, the youth, her early years. But if, if one examines carefully the exhibit that government counsel wants to use to point out that the, the appellant had the proper state of mind to remember her addresses, the court wants to look at page ER 74. That is from government's appellant's excerpts. All of those addresses are San Diego addresses. And I believe that the record shows that any arrest, any time spent in custody would have been in other cities other than San Diego. So I'm not even sure that Ms. Castro-Hortiz remembered where she lived. She did put down addresses, but they're all San Diego addresses. We ask that the court please return this case, remand the case to the district court so that the case moves forward to a trial on the evidence. Let me, let me ask you this. She was born in 1970. Is that right? In Mexico? Yes. And, and came here in 18, in 1978. And when she was six or seven, her aunt's husband sexually abused her. And then she became a permanent legal resident in 1980. And then while, while she was still a minor, she had an uncle that sexually abused her over the course of two years. And then her mother rented a room to a man who sexually abused her. And another boyfriend for more than a year. And then the mother left her and hadn't, and she didn't see her mother for eight years. And the kids went in foster homes. And then she saw foster dads molesting young girls who were living in the same home where she was living. And she ran away. And the police picked her up, took her to juvenile hall. And, and she was then put in another foster home. And this went on and on throughout her young life. And spent months in juvenile hall. And then was arrested when she was 19. Spent a night in jail. And she thought she was taken off the streets to sleep off her drug intoxication. And then a bench memo was later issued for her arrest because she failed to appear in court. And she was undergoing the use of PCP, I believe, for about a four-year period. And when she applied for naturalization, she said she hadn't committed any crimes. And in 1997, she became a citizen. And then she was arrested for alien smuggling and money laundering in September of 2008. To March of 2011, she was in prison, underwent government-initiated therapy, and attended weekly one-on-one psychiatric consultation for four months. And 125 daily group therapy sessions. And this went on. And this, this is when she realized she'd blocked out memories from her abusive past. She's attempted suicide multiple times. And she blocked out the past to survive. She was able to describe her past when she was deposed because she dealt with her trauma in the prison therapy programs. And it goes on and on and on. But today, she's back at work. As far as we know, she's left a clean life. Works 40 hours a week. Has three citizen children, which I mentioned earlier. All of which is correct, Your Honor. So that's the picture with her. That's the picture. So then the question is, what do we do? What do we do about her? Do we throw her out of the country or give her another chance? I have 30 seconds. This is not Fedorenko. This is not a Nazi war criminal. This is not, this is a very sympathetic figure who only asks to have her case returned to the district court and go forward on trial on the merits. I thank you, Your Honor. We thank counsel for the argument. And that case is submitted.
judges: Pregerson, Bybee, N.R. Smith